**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| HENDERSON APARTMENT VENTURE,<br><br>      Plaintiff,<br><br>      v.<br><br>ANDREW S. MILLER,<br><br>      Defendant.<br>_____ | 2:09-CV-1849-RCJ-PAL<br><br>**ORDER** |

Currently before the Court are Defendant's Motion for Summary Judgment (#31) and Plaintiff's Motion for Summary Judgment (#32). The Court heard oral argument on May 24, 2012. At the time of briefing, Defendant Andrew Miller was represented by counsel. At oral argument, Defendant informed the Court that he was now proceeding *pro se*.

**BACKGROUND**

**I.    Complaint**

In September 2009, Defendant Andrew S. Miller ("Defendant") filed a notice of removal to this Court based on diversity jurisdiction. (Pet. for Removal (#1) at 2). Defendant attached the complaint. (Compl. (#1) at 6-12).

In the complaint, Plaintiff Henderson Apartment Venture, LLC ("Plaintiff" or "HAV"), a Delaware limited liability company, sued Defendant, an Arizona resident. (*Id.* at 6). The complaint alleged the following. (*Id.*). On June 29, 2007, Plaintiff and Vested Housing Group, LLC ("Vested") executed a written agreement pertaining to the purchase and development of real property located in Clark County, Nevada. (*Id.*). Defendant was the president and sole owner of Vested. (*Id.*). Defendant had guaranteed certain payment obligations for Vested in

the agreement. (*Id.* at 7). Vested later assigned its position in the agreement to Henderson Lofts Devco, LLC ("HLD"). (*Id.*). Vested was the sole owner and manager of HLD. (*Id.*). After the assignment, Vested and Defendant remained liable for the performance of their obligations under the agreement. (*Id.*). Vested and HLD breached their obligations under the agreement and now owe Plaintiff approximately $1,500,000. (*Id.*). Plaintiff served Defendant a demand as required by the agreement and Defendant failed to honor his payment guaranty. (*Id.*).

Plaintiff alleged three causes of action. (*Id.* at 7-8). In the first cause of action, Plaintiff alleged breach of contract/guaranty. (*Id.* at 7). In the second cause of action, Plaintiff alleged unjust enrichment. (*Id.*). Plaintiff alleged that a loss of approximately $3,356,500 occurred pursuant to Section 20 of the agreement. (*Id.*). Pursuant to the agreement, Vested and HLD agreed to share the loss, but they have refused to do so. (*Id.*). Defendant, as guarantor, agreed to pay the amount covered by the loss-sharing provision and he would be unjustly enriched by retaining the money that he had agreed to pay. (*Id.* at 8). In the third cause of action, Plaintiff sought declaratory relief over the amount of loss pursuant to the agreement. (*Id.*). Plaintiff alleges that the loss is about $3,356,500 and Defendant believes the loss is $250. (*Id.*).

**II.   Summary Judgment Facts**

On June 29, 2007, Vested, the seller; Defendant, seller's guarantor; and Plaintiff, the buyer, entered into a Purchase and Sale Agreement ("PSA"). (PSA (#34) at 5). The PSA stated that Plaintiff was a Delaware limited liability company. (*Id.*). The PSA was to purchase a company formed by Vested at the time of closing whose sole asset would be a specific property in Henderson, Nevada. (*Id.* at 6, 12). At closing, Vested would convey the Property to the Company and simultaneously convey 100% of its ownership in the Company to Plaintiff for the purchase price.[1] (*Id.* at 12).

The PSA contained an assignment clause. (*Id.* at 29). Pursuant to the clause, Plaintiff consented to an assignment by Vested to an entity that would be solely owned by Vested

---

[1] The PSA provided a formula to calculate the purchase price, but did not provide a definitive purchase price. (PSA (#34) at 13-14).

provided that: (1) such entity be bound by Seller's obligations under the PSA; (2) Seller would not be released from liability under the PSA because of such assignment; (3) the assignment would be documented in a form acceptable to Plaintiff; and (4) the obligations of Seller's Guarantor would not be affected by the assignment. (*Id.* at 29-30).

The PSA contained a governing law clause which stated that the PSA would be "governed by and construed in accordance with the internal laws of the State of in which the Land [was] located," which is Nevada. (*Id.* at 31).

Section 20 of the PSA, Modifications and Terminations, provided in relevant part the following:

> If for any reason Buyer or Seller determines it is not willing to proceed with the Project once it has reviewed the Plans and Specifications, the No Further Action Letter, and the Final Project Budget, and a guaranteed maximum price bid from a qualified general contractor selected by Seller and approved by Buyer, the non-approving party shall notify the other of its election not to proceed and the parties agree to immediately cause an Appraisal of the Land to be performed.
>
> Within thirty (30) days of the completion of the Appraisal, the parties may jointly elect to attempt to sell the Land to a third party for at least the Appraised Value. If: (i) both the Buyer and Seller have not agreed to proceed with a third-party sale within the 30-day period described in the preceding sentence; or (ii) having timely agreed to sell the Land, have not entered into a mutually acceptable sale contract for the Land within 75 days after completion of the Appraisal, then either Buyer or Seller ("Offeror") shall have the option to offer to purchase all, but not less than all, of the interest of the other ("Offeree") by making a cash offer in an amount that must be equal to or greater than the Appraised Value ("Offer") to Offeree in writing setting forth the proposed price for Offeree's interest and the payment terms of such Offer and also granting Offeree the option to purchase the interest of Offeror at the same proposed price (subject to the 60-40 split that is described below) and on the same payment terms of the Offer.
>
> . . .
> If the accepted third party sale price or Offer results in a Profit, Buyer shall be entitled to a credit for the Preferred Buyer Credit and 60% of the Profit and Seller shall be entitled to 40% of the Profit. If the calculation results in a Loss, then Buyer shall pay 60% of the Loss and Seller shall pay 40% of the Loss (which payment obligation shall be guaranteed by Seller's Guarantor).
>
> By way of example only, in the instance of . . . (b) a Loss situation: if the accepted Offer or accepted third party sales price is $11,000,000 and if the Cost Basis[2] as of the Closing Date is $12,000,000 and the Preferred Buyer Credit

---

[2] Pursuant to the PSA, "Cost Basis" of the seller of the property "shall equal the sum of all of Seller's costs related to (a) Seller's acquisition of the Land from Owner, (b) the construction and operation of the Improvements and financing thereof, (c) marketing, management and leasing of the Property, and (d) the sale of the Company to Buyer." (PSA

3

>were $250,000, the Loss would equal $1,250,000 and Buyer would pay at closing 60% of the Loss or $750,000 and Seller would pay 40% of the Loss or $500,000.

(*Id.* at 34-35).

On June 28, 2007, Vested assigned all rights, title, interest, and obligations in the PSA, dated June 29, 2007, to Henderson Lofts Devco LLC ("HLD"). (Assignment & Assumption (#35) at 2). On July 2, 2007, Wachovia Bank, N.A., the lender; Principal Life Insurance Company for its Principal US Property Separate Account ("PUSPSA"), the purchaser; and HLD, the borrower, entered into a Loan Purchase Agreement. (Loan Purchase Agreement (#36) at 2). In the Loan Purchase Agreement, Wachovia agreed to make an acquisition loan to HLD in the amount of $13,100,000 to acquire certain real estate located in Henderson, Nevada, sufficient for a future development of apartment buildings. (*Id.*). The Loan Purchase Agreement required Principal Life Insurance to guaranty the loan. (*See id.* at 3-4; *see* Def. Mot for Summ. J. (#31) at 10; Pl. Mot. for Summ. J. (#32) at 3). The Loan Purchase Agreement was secured by a deed of trust on the property. (*See* Deed of Trust (#35) at 21).

On October 3, 2008, Vested sent Plaintiff a fax stating that it would invoke Section 20 of the PSA and purchase the company for $13,325,000. (*See* Pospisil Ltr. to Vested (#37) at 23). Thomas Pospisil, assistant general counsel for Principal Life Insurance, responded to Vested that Plaintiff would accept Vested's offer and would sell its interest for $13,325,000. (*Id.*). Pospisil noted that the closing had to occur on or before December 15, 2008 pursuant to Section 20 of the PSA. (*Id.*).

On October 14, 2008, Plaintiff filed its limited liability company certificate of formation

---

(#34) at 6). The costs included in the Cost Basis included, but was not limited to, "due diligence expenses, professional fees, closing costs, license and permit fees, insurance, overhead, plans and specifications, space planning, financing fees, loan interest payments, real estate taxes, construction costs, [and] brokerage commissions." (*Id.*). The following costs were also included in the Cost Basis: (i) hard costs, (ii) soft costs, (iii) development fee and land profit fee, (iv) finance costs, including the Construction Loan fee, related finance fees, interest on the Construction Loan, and closing costs, including attorney's fees, title insurance premiums, escrow fees and other customary closing costs; (v) legal fees related to the land acquisition and development, but excluding legal fees by either Buyer or Seller for negotiation and execution of this Agreement, the Construction Loan Documents, and the Loan Purchase Agreement; and (vi) Land Acquisition Costs. (*Id.* at 6-7).

4

with the Delaware Secretary of State. (*See* HAV LLC Agreement (#40) at 72). The LLC Agreement stated that the agreement had been entered into by Principal Life Insurance Company for PUSPSA, the sole member of the LLC. (*Id.* at 72, 75,78). The LLC Agreement stated that the company had been formed on October 14, 2008 as a Delaware limited liability company under the name Henderson Apartment Venture, LLC. (*Id.* at 72). The LLC Agreement was signed by Thomas R. Pospisil, assistant general counsel for Principal Real Estate Investors, and Dennis Ballard, counsel for Principal Real Estate Investors, LLC, authorized signatory for Principal Life Insurance Company for PUSPSA. (*Id.* at 77).

On November 19, 2008, Vested sent Rob Klinker, assistant managing director for Principal Real Estate Investors, a letter in accordance to Section 20 of the PSA. (Vested Ltr. to Klinkner (#37) at 27). The letter stated that Vested had provided Plaintiff with "its Offer on October 3, 2008, and [that Plaintiff had] accepted Seller's Offer by letter dated October 15, 2008. [Vested] elect[ed] that today [was] the settlement date for the purchase of [Plaintiff's] interest by [Vested]." (*Id.*). The letter then stated the following:

> Seller's Offer was in the amount of $13,325,000.000. Seller's calculation of the Cost Basis as of the settlement date is $13,325,251.80 per the attached reconciliation (which includes the Preferred Buyer Credit but excludes default interest, if any). This results in a Loss in the amount of $251.80. In accordance with the provisions of Section 20, Seller is required to pay 40% of the Loss, or $100.72. Seller's certified check to [Plaintiff] in this amount is enclosed with this letter.
>
> These deliveries conclude the relationship of Buyer and Seller under the Contract, and the Contract is terminated as of the close of business today.

(*Id.*). The reconciliation stated the following:

| | | |
|---|---|---|
| Loan balance: | | 13,169,051.91 |
| Accrued interest thru 11/19: | + | 18,028.11 |
| Accrued taxes: | + | 11,927.46 |
| Preferred Buyer Credit thru 11/19/08 | + | 126,244.32 |
| Cost Basis + Preferred Buyer Credit | | $13,325,251.80 |

(*Id.* at 28).

On December 1, 2008, Barney Ales, attorney for Plaintiff, sent Vested a letter stating that it had received the check for $100.72. (Ales Ltr. to Vested (#32-4) at 30). The letter stated the following:

5

> Please be advised that [Plaintiff] and Mr. Klinkner are holding the check as partial payment of the offer price you presented in the amount of $13,325,000.00 to acquire [Plaintiff's] interest in acquiring a membership interest in the Company as defined in the [PSA]. Such offer was made in your counsel's letter to Mr. Klinkner dated October 3, 3008 and accepted by letter on October 15, 2008. The balance in the amount of $13,324,899.28 should be wired on December 15, 2008 . . . ."

(*Id.*).

In November or December of 2008, HLD failed to pay the Loan Purchase Agreement at maturity. (*See* Lanz Email (#32-4) at 35). Wachovia delivered notice to PUSPSA that HLD had failed to pay off the loan at maturity and, pursuant to the Loan Purchase Agreement, PUSPSA was obligated to purchase the loan from Wachovia. (*Id.*). PUSPSA was required to wire $13,200,157.16 to pay off the principal and interest of the loan; $8,142.06 for payment of delinquent taxes on the property; and additional costs for the lender and title company. (*Id.*).

On August 7, 2009, Plaintiff (successor by assignment from PUSPSA) foreclosed on the property. (Trustee's Deed Upon Sale (#32-4) at 45).

## LEGAL STANDARD

In reviewing a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). Pursuant to Fed.R.Civ.P. 56, a court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the initial burden of identifying the portions of the pleadings and evidence that the party believes to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions,

6

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). Once the moving party has properly supported the motion, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The nonmoving party cannot defeat a motion for summary judgment "by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

## DISCUSSION

Both Plaintiff and Defendant filed motions for summary judgment. (Def. Mot. for Summ. J. (#31); Pl. Mot. for Summ. J. (#32)). Plaintiff seeks summary judgment on the first cause of action and third cause of action. (*See generally* Pl. Mot. for Summ. J. (#32) at 7-8). Defendant seeks summary judgment on all counts. (*See* Def. Mot. for Summ. J. (#32) at 1).

**I.    Count One: Breach of Guaranty**

With respect to the breach of contract claim, the parties raise the issues of (1) whether Plaintiff had the capacity to enter into the PSA when it was not a formed entity; (2) whether Plaintiff is attempting to circumvent Nevada deficiency law by suing Defendant for a loan he did not guarantee; and (3) whether Defendant fulfilled his obligations under Section 20 of the PSA.

**A.    Validity of the PSA**

Defendant argues that Plaintiff did not have the capacity to tender its "acceptance" to

7

the terms of the PSA because it was not a formed entity at the time of the PSA's execution. (Def. Mot. for Summ. J. (#31) at 14). Defendant asserts that the Court must apply Delaware law to determine whether Plaintiff was a legally formed entity with capacity to enter into the PSA. (*Id.*). Defendant argues that because Plaintiff was neither a *de jure* nor a *de facto* entity under Delaware law, Plaintiff did not have the capacity to enter into the PSA. (*Id.* at 15). Defendant contends that because Plaintiff did not have the legal capacity to enter into the PSA, the PSA is void under Nevada law. (*Id.* at 19).

In response, Plaintiff asserts that it ratified the PSA and all other agreements that it had executed prior to October 14, 2008, and argues that it can enforce any pre-organization contract made on its behalf. (Pl. Resp. to Mot. for Summ. J. (#48) at 6). Plaintiff also argues that corporation by estoppel applies. (*Id.* at 8).

In reply, Defendant argues that corporation by estoppel is not a valid Delaware doctrine. (Reply to Mot. for Summ. J. (#53) at 7). Defendant asserts that, even if it was a valid doctrine, Plaintiff would not be able to assert it because it made repeated and continuous misrepresentations that it was a validly formed entity when it was not. (*Id.* at 7-8). Defendant also asserts that there is no admissible evidence that Plaintiff ratified the PSA. (*Id.* at 8).

As an initial matter, Nevada law governs the substantive issues of contract formation, while Delaware law governs the validity of Plaintiff's corporate existence. *See* Nev. Rev. Stat. § 86.543(1) (stating that the laws of the state where a foreign limited liability company is organized govern its organization). In Nevada, in order for a plaintiff to bring a breach of contract action against a defendant, the plaintiff and defendant must have a contractual relationship. *Brown v. Kinross Gold U.S.A., Inc.*, 531 F.Supp.2d 1234, 1240 (D. Nev. 2008). Only a party to a contract can breach it. *Id.* A non-existent corporation does not have the legal capacity to contract. *See generally Jacobsen v. Stern*, 605 P.2d 198, 201 (Nev. 1980) (stating that a pre-incorporation contract with a promoter is only a valid obligation of the corporation upon express or implied ratification after incorporation).

In this case, it is undisputed that Plaintiff was not formally a limited liability company at the time it executed the PSA on June 29, 2007. As such, Plaintiff was not a *de jure* entity at

8

the time it contracted with Defendant. Under Delaware law, authorized persons may form a *de jure*[3] limited liability company by executing a certificate of formation and filing it with the Secretary of State. Del. Code Ann. tit. 6, § 18-201(a). A limited liability company is formed at the time of the filing of the initial certificate of formation or at a later date specified in the certificate of formation when there has been substantial compliance with the requirements of the statutory section. *Id.* at § 18-201(b). Because Plaintiff had not achieved formal status as a limited liability company when it purported to enter into the PSA with Defendant, Plaintiff cannot assert contract claims based on the PSA unless it can show either (1) that it was a *de facto* corporation at the time in question; or (2) Defendant should be estopped from denying Plaintiff's corporate status. *See Trustees of Peninsula Annual Conference of Methodist Church, Inc. v. Spencer*, 183 A.2d 588, 592 (Del. Ch. 1962) (examining Delaware law of *de facto* corporation); *see Bellis v. Morgan Trucking, Inc.*, 375 F.Supp. 862, 866 (D. Del. 1974) (applying concepts of estoppel to prevent a party from denying the existence of a corporation).

Under Delaware law, the existence of a *de facto* entity requires: "(1) a special act or general law under which [an entity] may lawfully exist, (2) a bona fide attempt to organize under the law and colorable compliance with the statutory requirements, and (3) actual user or exercise of corporate powers in pursuance of such law or attempted organization." *Trustees*, 183 A.2d at 592. A mere defect in the formality for an entity that has otherwise complied with the laws of incorporation does not bar a finding of *de facto* status. *Id.*

Here, Plaintiff cannot establish that it was a *de facto* LLC at the time it executed the PSA. Although, there is a law that permits Plaintiff to become an LLC, *see* Del. Code Ann. tit. 6, § 18-201, there is no evidence in the record to demonstrate that Plaintiff made a *bona fide* attempt to organize under that law and comply with the statutory requirements prior to entering into the PSA. Delaware Code § 18-201 requires the certificate of formation to have the name of the LLC, the address of the registered office and the name and address of the registered agent for service of process, and any other matters the members determine to include therein.

---

[3] A *de jure* corporation is one that is created in strict or substantial conformity to the governing statutes. *See* 8 Fletcher Cyc. Corp. § 3760.

Del. Code Ann. tit. 6, § 18-201(a)(1)-(3). There is no evidence that Plaintiff attempted to fulfill any of these requirements prior to entering into the PSA and, thus, it fails to establish that it made a *bona fide* attempt to become an LLC under this statute prior to executing the PSA. In fact, Thomas Pospisil, counsel for Principal Life Insurance, stated that he had drafted Plaintiff's LLC Agreement on October 14, 2008. (*See* Pospisil Depo. (#40) at 56-57). As such, Plaintiff was not a *de facto* entity at the time it executed the PSA.

Under the doctrine of corporation by estoppel, a person who contracts or otherwise deals with an entity as a corporation thereby admits that the entity is a corporation, and is estopped to deny its incorporation in an action arising out of the contract or course of dealing. 8 Fletcher Cyc. Corp. § 3910. However, because the doctrine of estoppel to deny corporate existence originates in equitable principles, estoppel does not apply when it would be inequitable to apply it or where equitable principles do not require its application, as in the case of fraud. *Id.* at § 3916. The estoppel rule does not apply in the case of fraud, "as where the recognition of a pretended corporation is itself brought about by false representations that it is incorporated." *Id.* at § 3917. There "must be ignorance of the truth and absence of equal means of knowledge of it by the party who claims the benefit of the estoppel." *Id.* at § 3905. "Knowledge on the part of the one claiming the estoppel that there is no corporation precludes an estoppel, without regard to whether the estoppel is relied upon by the corporation or by the party other than the alleged corporation." *Id.*

In *Int'l Sport Divers Assoc., Inc. v. Marine Midland Bank, N.A.*, 25 F.Supp.2d 101 (W.D. N.Y. 1998), the New York federal district court applied the principles of corporation by estoppel as set forth by Fletcher Cyclopedia Corporations and found that estoppel was unwarranted under the facts. *Id.* at 109-12. There, the International Sport Divers Association, Inc. ("ISDA") and Marine Midland Bank, N.A. ("Marine") had entered into a credit card program agreement in September 1992. *Id.* at 104. The contract had referred to ISDA as "a Connecticut corporation" although the entity was not formally incorporated under Connecticut law at the time the parties had entered into the agreement. *Id.* at 104-05. The court found that corporation by estoppel was inapplicable in that case because the president of ISDA had

admitted that he had represented ISDA as a corporation even when he knew it was not. *Id.* at 111. The court found that, as the person who had formed the entity ISDA, the president would "surely had at least an equal means of knowledge as to the requirements for incorporation in Connecticut and ISDA's true status." *Id.* The court found that the president could not claim that defendant was estopped from denying ISDA's corporate existence on that ground. *Id.*

Similarly in this case, Plaintiff fails to establish that corporation by estoppel applies. The facts demonstrate that Defendant did not know that Plaintiff was not a legally formed entity and that Plaintiff had represented to Defendant that it was a legally formed entity when the parties had executed the PSA. In his affidavit, Defendant stated that he, Vested, and HLD were "unaware that Plaintiff was not a legally formed entity, and/or not authorized to conduct business in Nevada, until well after this litigation commenced, in or about May 2010." (*See* Miller Aff. (#53-2) at 3). The affidavit stated that Defendant had learned that Plaintiff had become a legally formed entity on October 14, 2008, during discovery requests. (*Id.* at 4). Moreover, the PSA states that Plaintiff was a Delaware limited liability company. (*See* PSA (#34) at 5). Additionally, Thomas Pospisil stated at his deposition that "[b]y accident this limited liability company agreement was not executed. It was fully intended to be. It just didn't happen." (Pospisil Depo. (#40) at 60). As such, Plaintiff knew that it had not formed an LLC at the time it entered into the PSA and did not inform Defendant. Therefore, Plaintiff cannot establish that corporation by estoppel applies to this case.

Additionally, Plaintiff's argument that it ratified the contract once it had become a legal entity is misplaced. Under Nevada law, a pre-incorporation contract made by a promoter within the corporate powers, may become a valid obligation of the corporation when the organization expressly or impliedly ratifies the contract. *Jacobson*, 605 P.2d at 201. However, a contract with a promoter is not one with the corporation. *Id.* In this case, there is no contract between Defendant and a promoter and, thus, the principles of ratification do not apply. Instead, the unformed entity entered into a contract with Defendant. As such, ratification does not apply to this case.

Accordingly, the PSA is void because Plaintiff did not have the legal capacity to enter into the contract on June 29, 2007 because it was neither a *de jure* nor a *de facto* corporation at the time, and corporation by estoppel does not apply. Because there is no legal contract there can be no claim for breach of contract. As such, the Court GRANTS Defendant's Motion for Summary Judgment (#31) on Count One and DENIES Plaintiff's Motion for Summary Judgment (#32) on this count.

## II.    Count Two: Unjust Enrichment

Defendant asserts that Plaintiff's unjust enrichment claim fails as a matter of law because it is expressly predicated on an express agreement, the PSA. (Def. Mot. for Summ. J. (#31) at 25). Defendant also asserts that Plaintiff never conferred a benefit upon him and that he fulfilled any obligation he may have had by tendering a check for the "loss." (*Id.* at 26-27).

In response, Plaintiff argues that Defendant has been unjustly enriched because he owned 100% of Vested and Vested owned 100% of HLD. (Pl. Resp. to Mot. for Summ. J. (#48) at 14).

In reply, Defendant asserts that the unjust enrichment claim fails because Plaintiff supports his claim for damages on the PSA, an express written agreement. (Reply to Mot. for Summ. J. (#53) at 19). Defendant also asserts that he is not liable for Vested's alleged unjust enrichment solely because he is Vested's sole member. (*Id.*). Defendant asserts that Vested is a separate legal entity from himself and, thus, any benefit or enrichment that Vested acquired does not equate to enrichment to Miller. (*Id.* at 20).

The Nevada Supreme Court has stated that the "essential elements of quasi contract are a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *Leasepartners Corp. v. Robert L. Brooks Trust*, 942 P.2d 182, 187 (Nev. 1997). Unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another. *Id.* Unjust enrichment applies to situations where there

is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another or should pay for. *Id.*

Here, there is no legal written contract as discussed above. The contract is void because Plaintiff did not have the legal capacity to enter into a contract on June 29, 2007. Nevertheless, Plaintiff's unjust enrichment claim against Defendant Andrew Miller still fails. Plaintiff thought that it had a contract with Vested and/or HLD through an assignment. All of the money that had exchanged hands was for the benefit of those entities and not for Andrew Miller personally. Although it is true that Andrew Miller is the sole member of Vested and Vested is the sole member of HLD, the direct benefit of the quasi-contract went to the entities. Additionally, pursuant to Arizona LLC law, "a member, manager, employee, officer or agent of a limited liability company is not liable, solely by reason of being a member, manager, employee, officer or agent, for the debts, obligations and liabilities of the limited liability company whether arising in contract or tort, under a judgment, decree or order of a court or otherwise." Ariz. Rev. Stat. § 29-651. Moreover, Plaintiff has not attempted to pierce any veil that would hold Defendant, as the sole member of Vested, personally liable for the LLC's debts and obligations. Plaintiff may have an unjust enrichment claim against Vested or HLD, but it does not have an unjust enrichment claim against Defendant.[4] As such, Plaintiff has not demonstrated that any benefit occurred to Defendant Miller and the Court GRANTS Defendant's motion for summary judgment (#31) on Count Two.

**III.    Count Three: Declaratory Relief**

In the third cause of action, Plaintiff seeks declaratory relief over the amount of loss pursuant to the terms of the PSA. Because the PSA is void, the Court GRANTS Defendant's motion for summary judgment (#31) on this count and DENIES Plaintiff's motion for summary judgment (#32).

///

---

[4] Plaintiff only sued Andrew Miller and did not sue Vested or HLD.

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that Defendant's Motion for Summary Judgment (#31) is GRANTED in its entirety with prejudice.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (#32) is DENIED with prejudice.

The Clerk of the Court shall enter judgment accordingly.

DATED: This 6th day of July, 2012.

_____
United States District Judge